Filed 12/22/21  D.L. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| D.L.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF MADERA COUNTY,<br><br>    Respondent;<br><br>MADERA COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Real Party in Interest. | F083376<br><br>(Super. Ct. No. MJP018423)<br><br><br>**OPINION** |

-ooOoo-

## THE COURT\*

ORIGINAL PROCEEDINGS; petition for extraordinary writ. Thomas L. Bender, Judge.

D.L., in pro. per., for Petitioner.

No appearance for Respondent.

No appearance for Real Party in Interest.

-ooOoo-

---

\*    Before Levy, Acting P. J., Detjen, J. and Franson, J.

D.L. (father) in propria persona seeks an extraordinary writ (Cal. Rules of Court, rules 8.450–8.452)[1] from the juvenile court's orders issued at an 18-month review hearing (Welf. & Inst. Code, § 366.22)[2] terminating reunification services as to his now 14-year-old daughter, M.L., and setting a section 366.26 hearing. Father seeks a writ directing the juvenile court to provide him reunification services, including visitation. We conclude the petition fails to comport with the procedural requirements of rule 8.452 regarding extraordinary writ petitions and dismiss the petition.

## PROCEDURAL AND FACTUAL SUMMARY

M.L. has a long history of being in the foster care system. She was removed from her mother's custody in Oregon at a young age and moved from foster home to foster home. Over time, she developed behaviors associated with trauma and institutionalization. Father was unaware that he had a daughter until approximately February of 2018 when M.L. was 11. She was placed in his care in June 2018.

These dependency proceedings were initiated in October 2019, when the Madera County Department of Social Services (department) received a referral alleging child abuse. M.L. was at an afterschool program at school when father arrived " 'yelling and irate' " because she had not come home. Father forced her to go home with him. A while later, M.L. returned to school, stating she was afraid he was going to " 'beat her up.' " The staff went on a lockdown for fear father would return for M.L. M.L. hid in the principal's car and law enforcement was summoned. Law enforcement investigated and returned M.L. home. Father was still irate the following morning when he took M.L. to school. He threatened to sue the school. M.L. told the staff that father " 'pinned her down and beat her up' " the night before. The staff and M.L. were afraid father would return to the school and hurt M.L. M.L. did not have any injuries.

---

[1] Rule references are to the California Rules of Court.

[2] Statutory references are to the Welfare and Institutions Code.

Social worker Kristie Moran and Madera County Sheriff's Deputy Holladay met at M.L.'s school. Holladay said M.L. told him she was afraid to go home, and that father called her in as a runaway. Holladay said M.L. reported prior abuse but father denied hitting her. Father stated she was manipulative and had thrown him out of his chair over the summer. Father was disabled. M.L. was seeing a therapist, Charles Peugh, until she started to accuse him.[3] Father had a history of child abuse as a child.

M.L. told Moran she lived with father and her stepmother, Teresa Z. (Terry), father's significant other. The house was clean and stocked with food and there was always an adult to supervise her. However, there was a lot of yelling, and the year before Terry kicked father in his bad leg. He did not report it to the police because Terry begged him not to. On a scale of zero to 10 where 10 is extremely afraid, she rated her fear of being at home as an "[eight]" because father hit her. Terry stood by while he hit her and did nothing.

Father was angry the previous day because he found a cell phone in M.L.'s pocket and she was not supposed to have a cell phone. Father got mad because M.L. refused to give him the password to unlock her phone.

Father denied holding M.L. down and hitting her. She pulled him out of his chair and tackled him, causing him to scrape his knees. He was concerned about her mental health and asked for help from the school but was told she was fine. He was worried something was going to happen to her. She had a cell phone and was on social media even though he forbad it. He was angry at the school officials because they knew she was going to run away and did not tell him. During the conversation with Moran and Holladay, father escalated to yelling multiple times and had to be asked by Holladay to calm down.

---

**3** The record does not specify the nature of M.L.'s accusations against Peugh.

Moran conferred with her supervisor and a team decision meeting was scheduled for several days later to address the family issues and refer the family to the appropriate services. The meeting had to be rescheduled because of a staff shortage. When father was informed, he became irate and yelled at Moran because he had taken the day off to attend. Terry also yelled at Moran, stating they were already in Madera for the meeting and could not meet another day because they were busy. She told Moran the department could have M.L., and they would bring her there and drop her off. Shortly after, father and Terry arrived at the department offices and confronted Moran in the lobby. Moran explained to father that if he left M.L. with the department, it would be considered child abandonment. Father said he was going to get a lawyer because the department was harassing him. He yelled at M.L. to get in the car and the family left.

Because of father's combative and violent behavior, the department decided to file a dependency petition before the family situation escalated any further. The petition alleged M.L. came within the juvenile court's dependency jurisdiction under section 300, subdivision (a) (serious physical harm), (b) (failure to protect), and (c) (serious emotional damage) because father hit her in the past, pinned her down and beat her up, and failed to provide her proper mental health care. As a result, her mental health deteriorated, and she had to be involuntarily detained. (§ 5150.)

Father appeared at the detention hearing on November 21, 2019, and was disruptive and combative. He said he did not want M.L. in his care and left her at the courthouse. The department requested a protective hold, which the juvenile court granted. M.L. was placed into protective custody and into foster care. The court continued the hearing. Meanwhile, the department filed an amended petition, adding an allegation under section 300, subdivision (g) (no provision for support) that father was unable to provide or arrange a suitable plan for M.L.'s ongoing care and support.

Father denied the allegations at the detention hearing on December 5, 2019, and the juvenile court ordered M.L. detained. County counsel informed the court that M.L.

was placed with a family friend in the same school district where she was receiving assistance. The court set the matter for a jurisdictional hearing.

Due to multiple continuances and contested hearings, the jurisdictional hearing did not take place until August 2020. The juvenile court appointed a court appointed special advocate (CASA) for M.L. The juvenile court found the allegations under section 300, subdivisions (b) and (c) true and adjudged M.L. a dependent child. The court found the allegations under section 300, subdivisions (a) and (g) were not true and dismissed them. The court set the matter for a dispositional hearing.

The dispositional hearing was continued multiple times and conducted in March 2021. In its report for the hearing, the department recommended the juvenile court order father and M.L.'s mother to participate in reunification services. M.L. had adjusted to her foster home and was doing well in school. Her social worker noted M.L. was much more self-confident and spoke her mind. She had supervised telephone visits with father twice a week for 15 minutes. The visits generally went well, however, some conversations erupted into unhealthy exchanges between them. Father reported M.L. had reactive attachment disorder (RAD) and he encouraged her to speak up and make friends. He was taking classes to learn about RAD and planned to take a parenting class designed to address the disorder in children. He said he attended his services sporadically. When the social worker asked him if he would sign a release of information, he told her to mind her own business. He said M.L. was the one with a problem, not him.

M.L.'s therapist reported M.L. was making progress but also regressed at various times during her treatment. The therapist was concerned that continuous exposure to trauma triggers could cause further regression and prevent her from returning to a level of functioning where she could self-regulate and manage her emotions. M.L. requested not to have father in her treatment, which limited the ability to explore that relationship. The department believed father needed to demonstrate he could be emotionally supportive of M.L. as she processed her trauma.

The juvenile court ordered M.L. removed from parental custody at the dispositional hearing and ordered reunification services for father and M.L.'s mother. Father's services plan required him to participate in mental health counseling and complete a parenting program. The court set the 18-month review hearing for May 2021.

M.L.'s CASA submitted a report dated May 6, 2021 to the juvenile court. She informed the court that M.L. was previously thought to have RAD but was subsequently diagnosed with post traumatic stress disorder (PTSD). On May 5, 2021, M.L. was involuntarily detained after disclosing suicidal thoughts to her school principal and school counselor. It was discovered she had been cutting herself. She was scheduled to be released on May 6. Her foster parent stated she was unable to continue caring for M.L. At a follow up visit, M.L. was also diagnosed with a severe and single episode of major depressive disorder and prescribed medication.

The CASA was concerned that father would not participate in services. He was verbally aggressive and threatening to the departmental staff and told the CASA he did not want the department's help. M.L. told the CASA she was afraid of father and Terry and did not want to return home. The CASA listened in on approximately 10 of the telephone visits between father and M.L. Father did most of the talking and talked mostly about himself and his home life. If M.L. talked about herself, he changed the subject back to him. The CASA was concerned about the impact the telephone visits with father had on M.L. After some visits, M.L.'s mental health regressed and her thoughts turned "dark." M.L. wanted the telephone visits with father suspended. She expressed fear of him and was afraid he would show up unexpectedly at school or other locations. The CASA believed that if progress were to be made, father needed to cooperate with the department and engage in the services offered to him.

The 18-month review hearing was continued until June 2021. Prior to the hearing, the CASA informed the juvenile court that M.L. was involuntarily detained again on May 22, 2021, and released several hours later. She was in respite placement for three weeks

and then placed with a foster mother on June 10. The CASA visited her on June 14 and found her confused, disappointed and agitated. M.L. felt secure in her former foster home because she knew where she would be going to school and who her friends would be. She was uncertain about her future in her new home. While the CASA was there, M.L. was withdrawn, wearing black clothing and a thick beanie on her head.

On June 18, 2021, M.L. was involuntarily detained after expressing thoughts about harming herself and others. She was hospitalized for two days at a community hospital and released to her foster parent on June 20. The department scheduled a meeting for June 21 to discuss M.L.'s placement. However, before the meeting, the foster parent gave a 14-day notice to remove M.L. because M.L. reported hearing voices telling her to hurt herself or others. Father participated in the meeting by telephone but had to be excluded for being verbally abusive to the departmental staff.

In its report for the 18-month review hearing, the department recommended the juvenile court terminate reunification services and set a section 366.26 hearing. Father had not completed any of the services ordered for him and refused to speak to the social worker. He accused her of " 'caus[ing] this mess' " with M.L. and " 'coaching' " her to be adopted. He stated, " 'Your stupidity will be brought up in Court because you're stupid.' " He also said, " 'I hope you have kids because I will follow you around. I will be your worst nightmare. I will call C.P.S. on you.' " When the social worker told father she would not be spoken to in that manner, he screamed, " 'F*** you b****.' "

M.L.'s doctor said she suffered from extensive mental health issues and was being treated by a psychiatrist and a therapist. She reported her " 'anxiety and helplessness' " continued when she thinks about visiting father. Her doctor recommended her visits with father remain supervised. He reported, "Recently, [M.L.] had a severe exacerbation of trauma symptoms after having a phone call conversation with her father. This isn't the first episode in which [she] got triggered after interacting with him. [The] [d]ay before

[the] last hearing, [she] experienced nightmares about her abuse inflicted by her father. [Her] [m]edication [was] adjusted to manage [her] trauma symptoms."

Father appeared by telephone at the 18-month review hearing on September 21, 2021. The juvenile court noted that the parents had not completed reunification services and it was inclined to follow the departments' recommendations. Father stated, "There was never any services offered to me. They keep saying, 'services.' They never do anything." He continued, "They talk a good game, but they don't do sh\*\*. Excuse my language." The court stated it would like for M.L. to continue to receive help and visitation with father if it was appropriate. After counsel submitted the matter, the court terminated reunification services and set a section 366.26 hearing for January 10, 2022. After the court suggested father might want to talk to his attorney, he stated, "Yeah. I'm sorry I ever heard of Madera County. You guys are the most pathetic people I have ever [come] in contact with."

## DISCUSSION

As he did during the proceedings below, father expresses his dissatisfaction with the department's handling of his case. He claims, for example, he was not notified of his daughter's status or provided pictures of her. He attached various documents to his petition, the majority of which are not included in the appellate record, but did not explain their significance to his purpose in filing a writ petition. The documents appear intended to bolster an argument that M.L. is manipulative and regrets causing father difficulty, and that father is making efforts to improve himself through education. Father fails, however, to raise a claim of judicial error, which compels us to dismiss the petition.

" 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

8.

The purpose of these writ petitions is to allow the appellate court to achieve a substantive and meritorious review of the juvenile court's orders and findings issued at the setting hearing in advance of the section 366.26 hearing.  (§ 366.26, subd. (*l*)(4)(A).)

Rule 8.452, which sets forth the content requirements for an extraordinary writ petition, requires the petitioner to identify the error(s) he or she believes the juvenile court made and to support each alleged error with argument, citation to legal authority, and citation to the appellate record.  (Rule 8.452(b).)  In keeping with rule 8.452(a)(1), we will liberally construe a writ petition in favor of its adequacy where possible, recognizing that a parent representing him or herself is not trained in the law.  Nevertheless, the petitioner must at least articulate a claim of error and support it by citations to the record.  Failure to do so renders the petition inadequate in its content and the reviewing court need not independently review the record for possible error.  (*In re Sade C.* (1996) 13 Cal.4th 952, 994.)

By the time a dependency case reaches the 18-month status review hearing, the juvenile court has few options.  It must either return the child to parental custody or set a section 366.26 hearing to select a permanent plan unless the court finds exceptional circumstances warrant continuing services beyond 18 months.

The juvenile court must return the child to parental custody at the 18-month review hearing unless it finds by a preponderance of the evidence that doing so would "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."  (§ 366.22, subd. (a).)  "In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services. [Citations.]  The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement."  (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.)  A parent's failure to participate regularly and make substantive progress in court-ordered treatment programs constitutes prima facie evidence that return would be detrimental.  (§ 366.21, subd. (e)(1).)  If the

9.

court finds it would be detrimental to return the child, it must set a section 366.26 hearing.  (§ 366.22, subd. (a)(3).)

Exceptional circumstances that would allow the juvenile court to continue reunification services are where the parent was never provided reasonable reunification services (*In re M.F.* (2019) 32 Cal.App.5th 1, 21) or where the parent qualifies under any of the circumstances listed in section 366.22, subdivision (b).[4]

Here, father's failure to regularly participate and make substantive progress in his court-ordered services is prima facie evidence of detriment, which he does not challenge. Beyond prima facie evidence, there is compelling evidence that father's behavior was upsetting to M.L. and threatened her ability to advance in her trauma recovery.  In addition, father does not raise any of the exceptions that might have warranted an order continuing reunification services.  Consequently, the juvenile court had no choice but to terminate reunification services and set a section 366.26 hearing.

In light of father's failure to raise a claim of error, we dismiss his petition because it fails to comport with rule 8.452.

## DISPOSITION

The petition for extraordinary writ is dismissed.  This court's opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A).

---

**4**　　To qualify, the parent must be a resident of a court-ordered substance abuse treatment program; or recently discharged from incarceration, institutionalization, or the custody of the United States Department of Homeland Security; or a minor or nonminor dependent at the time of the initial hearing.  The court must also find the parent is making significant and consistent progress, there is a substantial probability the child will be returned to parental custody, and it is in the child's best interest to continue reunification efforts.  Under those circumstances, the court may continue services up to 24 months from the date the child was initially removed from parental custody.  (§ 366.22, subd. (b).)

10.